FRUGE, Judge.
Plaintiff brought this suit for compensation under Paragraph Two of L.S.A.R.S. 23:1221 for an injury alleged to have produced permanent total disability to do work of any reasonable character, and to recover penalties and reasonable attorney’s fees as provided for by L.S.A.-R.S. 22:658.
After trial on the merits, plaintiff was awarded compensation benefits for total permanent disability, not to exceed four hundred weeks, subject to credits for the amounts previously paid, but plaintiff was denied his claim for penalties and attorney’s fees. As appellant, plaintiff prosecutes this appeal only for the purpose of having this court review the judgment denying him penalties and attorney’s fees. Hence, the sole question here presented is whether he is entitled to this assessment.
The pertinent parts of L.S.A.-R.S. 22:658 require all insurers insuring any type of contract, other than those specified in L.S.A.-R.S. 22:656 and 22:657, to pay *414 the amount of any claim due any insured, including any employee under our Workmen’s Compensation Statute, within sixty days after receipt of satisfactory proof of loss from the employee, or failing to do so, when such failure is found to be arbitrary, capricious, or without probable cause, to be subjected to a penalty, in addition to the amount of the loss, of twelve percent damages for the total amount of the loss, payable to the employee, together with all reasonable attorney’s fees for the prosecution and collection of such loss.
After a review of the judgment, the record, and the briefs, we find the facts to be as follows :
Johnny Guillory was employed by the Foster Wheeler Corporation, defendant’s insured, as a construction worker. About Noon on November 30, 1966, plaintiff and several other employees were attempting to unload a pump weighing several hundred pounds from the back of a truck. One of the employees on the truck lost his grip on the end that he was carrying, thereby forcing the weight of the pump on the plaintiff who was standing on the ground. It then being lunch time, plaintiff knocked off and laid down. When he tried to get up, he could not do so, and was told to go to the first aid station. He was then taken to a physician in Sunshine, Louisiana, who, after examination, treated plaintiff for a low back injury. Plaintiff was then returned to the first aid station at his place of employment, where he was given a “letter” to be taken to the Opelousas General Hospital, where he was subsequently hospitalized. Plaintiff remained in the hospital for his arm and back injuries for a period of two to three weeks, with weekly benefits and payment of medical expenses being commenced by the insurer.
At Opelousas General Hospital, Dr. R. Luke Bordelon, orthopedist, diagnosed plaintiff’s condition as a lumbar strain and a possible strain of the right arm. This diagnosis was confirmed by Dr. Donald Gremillion, who examined plaintiff on December 2, 1966.
In Dr. Bordelon’s report of January 20, 1967, he described plaintiff as having “ * * * had complaints of pain in his head and feeling as though his head was being pulled off.” He had some complaint of pain in the back, but this was not specific. When directly questioned, he had some complaint of pain in the right shoulder, but again, this was not specific. It was his opinion, as of the time of a January 20, 1967 examination, that there was * * ''& no organic orthopedic physical impairment' present”, but that “ * * * the patient is having difficulty on a non-organic basis and I am not sure whether this is hysteria or an impending decompen-sation. I suggested that the patient consult his family doctor in regard to this and I am discharging him from my care as I do not feel that any orthopaedic impairment is present”.
The insurer, Liberty Mutual Insurance Company, discontinued benefits on January 18, 1967, and such were never resumed.
On January 21, 1967, plaintiff was seen by Dr. George Bourgeois. Dr. Bourgeois’ report noted bizarre symptomology, including several episodes of “ * * * some type of spell during which he couldn’t recognize members of his family and felt a pulling at the back of his head and a shaking of his back”. In his summary he stated:
“This patient has rather bizarre symp-tomology which would indicate a psychiatric 'disturbance. He does however have some symptoms compatible with early cardiac decompensation and has a definitely abnormal EKG. I feel that this patient definitely warrants further cardiac and psychiatric evaluation(Emphasis supplied)
The apparent lack of true orthopedic disability, originally noted by Dr. Bordelon, was further confirmed by Drs. Webre and Dunning, Orthopedists, on April 10, 1967 and June 27, 1967, respectively. The evaluation of both these specialists was simply *415 that they could not find in plaintiff any orthopedic reason for his complaints.
Due to his continued complaints, plaintiff was referred to Dr. William P. Cloyd, a neuro-psychiatrist in Lafayette, Louisiana. The first visit took place on June 26, 1967.
Dr. Cloyd’s examination revealed that plaintiff suffered from a “severe depressive reaction” with complaints of pain, in the chest and back, problems with sleep, and personal feelings that he would be found dead if things did not change. Dr. Cloyd prescribed in the way of drugs, antidepressants and tranquilizers, and from August 2 to August 11, 1967, plaintiff received electro-shock treatments. After no significant improvement, Dr. Cloyd, on August 8, 1967, advised that plaintiff be sent to a hospital.
On August 22, 1967, plaintiff’s wife applied for and obtained a court order for plaintiff’s commitment to the Central Louisiana State Hospital at Pineville.
Plaintiff remained at the hospital from August 24, 1967 until he was granted convalescent leave on October 27, 1967. While at the hospital, plaintiff was treated by Dr. Kirkpatrick. The doctor testified at trial that it was his feeling that plaintiff suffered from a psychiatric disorder, mainly depressive or reactive depression. The problem was called “reactive” because it appeared to be related to external circumstances which seemed to have precipitated or brought about his depression. Questioned about the relationship of plaintiff’s mental problems to the accident, the doctor testified that there appeared to be a relationship between the two inasmuch as the history indicated that he was working up until the time of the accident and had not been having any difficulty, and then following the accident and his inability to work, he became morose and depressed. Answering a hypothetical question based on the factual situation in this case, the doctor replied that he would have to assume that there was a relationship between the accident and the symptomatology.
As of the time of plaintiff’s discharge from Central, it was Dr. Kirkpatrick’s opinion that plaintiff was incapacitated from doing heavy manual labor, employment to which he was accustomed. The prognosis was rather indefinite, due to his age, but the outlook was generally poor with slow recovery. Asked as to the possibility of plaintiff’s being a malingerer, the doctor was positive that plaintiff felt his symptoms genuine.
After plaintiff’s release from the Pine-ville Hospital, he was referred to the Lafayette Mental Health and Treatment Clinic for further treatment and was subsequently seen by Dr. Cloyd. Dr. Cloyd continued treating the plaintiff by the use of a variety of psychiatric drugs, primarily anti-depressants and anti-anxiety agents. As of the date of his last examination, March 22, 1968, two days before trial, the doctor reported that the plaintiff had improved but was not well, and in fact he believed plaintiff to be “entirely incapacitated” from work activity similar to before. He noted plaintiff’s illness to be of indefinite duration, with need of further examination and medical treatment monthly.
As noted previously, the trial court awarded plaintiff total and permanent compensation benefits, noting in its written reasons for judgment that the disability due to the mental problem had been sufficiently proved for judgment.
As grounds for a reversal, plaintiff alleges that the trial court erred in not finding that defendant insurer acted unreasonably, arbitrarily, and without probable cause, in their termination of payments, their failure to reinstate payments, and their failure to furnish medical payments in the face of uncontroverted medical evidence of plaintiff’s disability.
Plaintiff alleges that the defendant had only two “excuses”, neither of which was well founded, which they used as a defense *416 to the imposition of penalties and attorney’s fees. The first of these, says plaintiff, was defendant’s allegation in answer that they would require the plaintiff to prove the occurrence of the accident before allowing him compensation. The second, also in their answer, being that of defendant’s allegation that they had terminated payments upon receipt of reports by competent medical experts that plaintiff’s disability resulting from any accident had been cured, and that there was no proof of causal connection between the accident and the alleged mental problem following the accident.
In their brief, defendants answered plaintiff’s argument, and attempted to explain in detail the grounds upon which they terminated the payments. Since the defendants seem to agree in brief that their liability for penalties and fees should center around our interpretation of the merit of either of these two excuses, we shall concentrate our discussion around these.
As to the first “excuse”, plaintiff alleges that there was sufficient evidence to the knowledge of defendant of the occurrence of the accident so that their allegation in answer was not in good faith.
After a reading of the record, this court agrees with plaintiff that the evidence clearly reveals that soon after its occurrence the accident was reported to the person in the employment of the defendant’s insured to whom such were to be reported. Furthermore, plaintiff was brought to a nurse at the employer’s first aid station. He was taken by the defendant’s insured to a physician in Sunshine, Louisiana, which physician confirmed to the insurer on its own form, dated December 16, 1966, that he had examined and X-Rayed plaintiff for a back injury on November 30, 1966, and had observed muscle spasms, applied heat treatment and medication, and had prescribed exercises. After plaintiff was seen by this physician, he was returned to the first aid station, put to bed, and later given a “letter”, by one of defendant insured’s agents, to enter the Opelousas General Hospital.
There seems to be little question that defendant was made aware of the occurrence of a compensable accident so as to make its allegation in answer not in good faith. It being up to this court to decide whether, at the time of the termination of benefits, there was in fact a clear question as to the occurrence of the accident, we feel that there was none. Thus this “excuse” provides defendant with no protection from an imposition of penalties and fees.
As to the second “excuse”, the plaintiff alleges that the defendants are relying on their allegation in answer, that at the time of the termination of payments they had received competent medical evidence of the lack of further disability as a result of the accident. In their brief to this court, the defendants stand behind this ground for termination, and further, they allege as an alternate or extension to the above argument that even though there might have been signs of disability due to a “severe depressive reaction”, said condition was not brought to their attention as being sufficiently work-connected, so that a refusal to reinstate compensation benefits or medical treatments therefor could be said to have been capricious, arbitrary, or without probable cause.
After a study of the record in this regard, we find that there is no dispute among the medical experts. Drs. Bordelon, Gremillion, Dunning and Webre, all orthopedists, found no continued “orthopedic” disability in plaintiff. Plaintiff did have, however, a mental problem and this resulted in need for treatment, hospitalization at a state mental hospital, and at the time of trial, continued treatment for the condition. The question to be answered however, is how apparent, before judgment, was the causal connection between the accident and the mental problem.
*417 A review of the medical evidence forces us to agree with the contentions of defendants that, prior to trial, there was a lack of sufficient evidence connecting the mental problem to the work-accident. In their reports, Drs. Bordelon, Bourgeois and Gremillion, suggested the possibility of a mental condition and recommended further study, but no etiology for the condition was given, nor was any reference to its having resulted from the accident ever made. Not until the report of Dr. Cloyd, which defendants received a few days before the filing of the suit, was there any suggestion of a causal relationship. Dr. Cloyd, as the treating psychiatrist, gave a report in which the only mention of an opinion as to the cause of plaintiff’s problem was the following: “* * * [T]he condition could probably be associated with the accident.”
Considering the jurisprudential rule as exemplified by the case of Guidry v. Travelers Insurance Company, 210 So. 2d 399 (La.App.3d Cir., 1968), that a plaintiff must prove by a preponderance of the evidence, the same as in any other civil case, that his disability is causally connected with the accident, speculation, conjecture and possibility not being sufficient, we cannot say that, prior to trial, defendants were aware of the compensability of plaintiff’s condition so as to make their refusal to furnish benefits arbitrary, capricious and without reasonable cause.[1] The same applies to their failure to furnish medical treatment. There is no duty to furnish medical treatment for conditions which have not been sufficiently established as resulting from an accident.
For the foregoing reasons, the judgment of the trial court is hereby affirmed. Costs to be paid by plaintiff-appellant.
Affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.

. The comments and ultimate ruling of this opinion do not reflect the views of the author, but he merely hows to the will of the majority.